

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed June 28, 2010**

---

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Case No. 09-43665-dml-7 |
| Stephen Anthony Warren, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| Lida T. Mosiman, | § | |
| Plaintiff | § | |
| | § | Adversary No. 09-04282 |
| v. | § | |
| | § | |
| Stephen Anthony Warren, | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

The above-styled adversary proceeding (the "Adversary") was commenced on August 12, 2009, by Lida T. Mosiman ("Mosiman") against Debtor Stephen Anthony Warren ("Warren"). Mosiman seeks a determination by the court that the debt that Warren owes her is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code

1

(the "Code") (11 U.S.C. §§ 101 *et seq.*). The Adversary was tried on April 12, 2010. At the trial, the court heard testimony from Warren, Mosiman, Leslie Warren Bird ("Bird"), and Bill Cavanaugh ("Cavanaugh"), and exhibits were entered into evidence, identified as necessary below.

The court exercises jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(I). This memorandum opinion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052.

**I.     BACKGROUND**

Warren and Bird were married in January 1999 and were divorced in April 2005. During their marriage, they had three children, Emma Rose Warren ("Emma"), Amelia Faith Warren, and Savannah Grace Warren. Before Warren and Bird were married, Warren had met Mosiman and developed a friendship with her. For a time, they carried on a joint business venture. However, about one year before his marriage to Bird, Warren fell out of contact with Mosiman.

Near the end of his marriage, Warren, in desperate straits, contacted Mosiman for the first time in approximately five years. Following this contact, Mosiman made personal loans (the "Loans") over the course of several years to Warren totaling approximately $500,000. Warren acknowledged his debt and listed Mosiman on his Schedule F as a creditor owed that amount. Warren used the proceeds of the Loans to pay attorneys' fees, court costs, and other expenses related to his divorce from his now ex-wife, Bird, and the child custody battle associated with the divorce and to pay for medical expenses on behalf of Emma.

Sometimes Mosiman advanced money to Warren directly, and sometimes she paid for goods or services on Warren's behalf. For example, Mosiman initially hired Ike Vanden Eykel of Koons, Fuller, Vanden Eykel & Robertson to represent Warren in his divorce. After receiving approximately $137,000 in fees for representing Warren in a divorce apparently involving few or no assets, Vanden Eykel withdrew from representation before the case even went to trial.[1] Mosiman then hired McCurley, Orsinger, McCurley, Nelson & Downing, which firm accrued approximately $140,000 in additional fees.

Warren made certain representations to Bird in persuading her to make the Loans. These representations fall into two different categories: (1) representations regarding repayment of the Loans; and (2) representations regarding Bird, Cavanaugh (his former father-in-law), and his daughters. The representations regarding repayment of the Loans included (a) that he would repay the Loans and (b) that he would give Mosiman part of every check he received until the Loans were repaid. Warren's representations regarding Bird, Cavanaugh, and Warren's three daughters included: (a) that Cavanaugh was molesting one of Mosiman's daughters; (b) that Warren could not support himself because of criminal charges pending against him and the high cost of divorce attorneys; (c) that he felt he needed the best attorneys to represent him in his divorce; (d) that he needed a decent place to live to assist in his effort to obtain custody of his daughters; (e) that he was worried about Bird's mental condition; (f) that Bird had filed a false rape charge against him; (g) that Emma showed signs of illness and Bird was refusing to seek

---

[1] The court is troubled by the apparently cavalier approach of Vanden Eykel and his firm to their responsibilities to Warren. Were a lawyer before this court to act in such a fashion, the court would very likely require disgorgement of fees.

treatment; (h) that he needed money for Emma's doctors; (i) that he needed to take Emma to a doctor in Alabama; (j) that Emma's illness affected primarily Jewish children and, because neither he nor Bird were Jewish, he was not sure if he was Emma's biological father; (k) that Bird had taken everything out of his house and put it in storage; (l) that Bird had tried to kill him in his sleep; (m) that he believed that Bird was going to hurt their daughters; (n) that their daughters showed him provocative poses in which Bird allegedly photographed them; and (o) that his daughters had cuts in inappropriate places.[2]

## II. DISCUSSION

Mosiman asserts that the Loans should be declared nondischargeable under section 523(a)(2)(A) of the Code because they were allegedly procured fraudulently. It is her position that the statements Warren made to her in convincing her to make the Loans amounted to false pretenses, false representations and/or actual fraud within the meaning of that section. Section 523(a)(2)(A) of the Code provides in relevant part that "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for money . . . to the extent obtained by false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A). In this case, there is no question that the Loans represent a debt for money.[3] The only question, then, is whether the Loans were obtained

---

[2] Mosiman alleged additional representations of the same nature as those listed above. She did not, however, establish through of the evidence that the additional representations were actually made. The court is only able to find that the representations above were actually made because Warren admitted to making them during his examination by Mosiman's counsel. Otherwise, the evidence is equally weighted and so Mosiman has not shown that it is more likely than not that the additional statements were actually made. The burden of proof in a nondischargeability action is proof by a preponderance of the evidence. Under that burden, if the evidence is equally weighted on both sides, then it is not more likely than not that that elicited by either side is true, so Mosiman has not met her burden of proof. *See, e.g., Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1357 n. 2 (6th Cir. 1992) ("Where the weight is equally divided between the plaintiff and the defendant, the party bearing the burden of proof must lose.").

[3] The fact that Mosiman paid some of the money to lawyers or doctors on Warren's behalf instead

by false pretenses, a false representation, or actual fraud. The Fifth Circuit has distinguished between the elements of a claim seeking a denial of a discharge for (1) false pretenses or a false representation and (2) actual fraud. *Recoveredge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995). Either way, the alleged fraud or false representation must involve the debtor's "moral turpitude or intentional wrong[,]" and fraudulent acts implied in law that may exist in the absence of bad faith are not sufficient to deny the debtor's discharge. *Vizzini v. Vizzini (In re Vizzini)*, 348 B.R. 339, 343 (Bankr. E.D. La. 2005), *aff'd*, 234 Fed. Appx. 234 (5th Cir. 2007) (quoting *In re Chavez*, 140 B.R. 413, 419 (Bankr. W.D. Tex. 1992)).

It is well established that the burden of proof a creditor must meet to have a debt declared nondischargeable is proof by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287 (1991). A fact is proven by a preponderance of the evidence if the finder of fact—here the court—finds it is more likely than not, based on the evidence, that the fact is true. *See, e.g.*, *In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 909-10 (5th Cir. 1993) (Parker, D.J., sitting by designation, concurring in part and dissenting in part). Thus, in order for Mosiman to prevail, the court must find that she has shown through the evidence presented at trial that it is more likely than not that facts satisfying each element of her claims are true.

In order for the court to deny discharge of a debt under section 523(a)(2)(A) on the basis that the debt was procured by false pretenses or a false representation, the

---

of transferring the money to Warren directly does not mean that the money was not "obtained" within the meaning of section 523(a)(2)(A). *See* 4 Collier of Bankruptcy ¶ 523.08[1][a] (16th ed. 2009) (citing *Brady v. McAllister (In re Brady)*, 101 F.3d 1165 (6th Cir. 1996); *HSSM #HSSM no. 7 Limited P'ship v. Bilzerian (In re BIlzerian)*, 100 F.3d 886 (11th Cir. 1996); *Ashley v. Church (In re Ashley)*, 903 F.2d 599 (9th Cir. 1990)).

plaintiff must prove that the debtor made representations that were "(1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party." *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992). Courts have consistently found that a debtor's silence regarding a material fact equates to a material misrepresentation sufficient to support denying a debtor's discharge. *See, e.g.*, *AT&T Universal Card Servs. V. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001).

The requirements for denying a debtor's discharge for actual fraud under section 523(a)(2)(A) are: "(1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations." *Pentecost*, 44 F.3d at 1293 (quoting *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991)).

### A. Representations Regarding Repayment of the Loans

The court concludes that a promise to repay is not a statement describing past or current facts. It is statement describing what the promissor will do in the future. Thus, a promise to repay cannot constitute false pretenses or a false representation for purposes of section 523(a)(2)(A) because the second element of the three-part test is not met. This view is consistent with the Fifth Circuit's application of the actual fraud, as opposed to the false pretenses or false representation, elements in determining whether credit card debt could be declared nondischargeable based on breach of an implied promise to pay.[4] *See*

---

[4] Since 1984, Code § 523(a)(2)(C) has dealt with credit card debts; that section adopted the Court of Appeals' determination that use of a credit card amounted to both a promise to pay the debt incurred and a representation that the debtor could do so.

6

*Mercer*, 246 F.3d 391. Thus, Warren's promise to repay Mosiman will be assessed against the elements of actual fraud.

The next question, then, is whether the statements regarding repayment of the Loans amount to actual fraud. The court concludes that they do not. In order for those statements to have been fraudulent, Warren would had to have known they were false when he made them, and he would had to have made the statements with the intention to deceive Mosiman. In this case, these two elements are really one in the same because the only way a person can say "I will pay you back" and know it to be false is if he is saying it with the intention to deceive. That is, one cannot know such a statement about one's own actions in the future to be false unless one has the intention not to carry out those actions. *See, e.g.,* Restatement (Second) of Torts, § 530(1) (1977) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.") The evidence, however, suggests that Warren did intend to pay Mosiman back—he actually paid her $3000—but was simply unable to do so.[5]

Mosiman cites *LA Capitol Federal Credit Union v. Melancon (In re Melancon)*, 223 B.R. 300 (Bankr. M.D. La. 1998), for the proposition that "[i]f a debtor knows that he is hopelessly insolvent, and that he cannot repay the money he is borrowing, it is not possible for that debtor to intend to repay." *In re Melancon*, 223 B.R. at 324. The *Melancon* case, however, is inapposite. The court there went on to explain that evidence of a debtor's ability or inability to repay should be considered "to the extent it sheds light

---

[5] There is no evidence that Warren represented to Mosiman that he had, at the time the Loans were made, the ability to repay her. Quite the contrary, Warren left no doubt that repayment of Mosiman depended on his future financial success. Moreover, a transcript from state court offered by Warren at the Hearing opens to question whether Mosiman advanced the Loans in expectation of repayment.

7

on . . . intent," and the court specifically attempted to avoid what it called the "error" of relying solely on such evidence in determining fraud. *In re Melancon*, 223 B.R. at 324. In *Melancon*, the debtor had used cash advances from her credit card to support her gambling habit. Thus, *Melancon* stands for the proposition that use of a credit card to obtain cash advances *may* be fraudulent when, at the time the cash is advanced, the cardholder does not have the ability to pay it back. The facts in *Melancon* are simply too dissimilar from the case at bar for the rules announced in it to be applicable here.

Even if it were the case that fraudulent intent could be conclusively established by proving that Warren was unable to repay the loans when said he would do so, Mosiman has failed to prove that she justifiably relied on that promise. "[A] a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Field v. Mans*, 516 U.S. 59, 71 (1995) (quoting Restatement (Second) of Torts, § 540 (1977)). Thus, proving justifiable reliance is a lesser burden than proving reasonable reliance. *Id.* But unlike the creditor in *Melancon*, Mosiman was fully aware of Warren's financial situation. She knew that he was unemployed and she knew that he was having difficulty finding work.

**Representations Regarding Warren's Ex-Wife, Daughters, and Father-in-Law**

The court notes at the outset that the representations Warren made regarding his ex-wife, daughters, and father-in-law are not typical of the types of representations usually at the center of dischargeability complaints under section 523(a)(2)(A) of the Code. The normal type of representation on which a dischargeability complaint is based has to do with the debtor's qualifications, source of repayment, securitization, use of the funds, etc.[6]

---

[6] *See, e.g., Tower Credit, Inc. v. Combs (In re Combs),* 2010 Bankr. LEXIS 1745 (Bankr. S.D.

That is, the misrepresentation usually has a direct relationship to the monetary transaction. Here, however, the representations are not related to the actual loan in the usual way. They do not relate to Warren's qualifications, his ability to securitize the Loans, his source of repayment, his use of the funds, or anything along those lines.[7] The court has searched the case law and has been unable to find another case under section 523(a)(2)(A) where the alleged misrepresentations were similar to those in the case at bar.

Considering that "[c]onsistent with the Code's basic purpose of relieving the honest debtor from the weight of oppressive indebtedness and permitting him to start afresh, *exceptions to discharge are to be construed narrowly*,"[8] the court is reluctant to conclude that the kind of misrepresentation contemplated by section 523(a)(2)(A) includes misrepresentations that are tangential to the financial transaction that forms the basis for a creditor's claim. Thus, construing the Code's exceptions to discharge narrowly, the court

---

Ohio June 1, 2010) (where the debtors failed to disclose negative cash flow, failed to disclose an outstanding loan, and misrepresented on their loan application that they had no dependents); *Islamov v. Ungar (In re Ungar)*, 2010 Bankr. LEXIS 1441 (8th Cir. B.A.P. May 21, 2010) (where the creditor continued to advance funds to the debtor to invest on the creditor's behalf based on false reports that the investments were lucrative, when in fact the debtor either spent the money or lost it in the stock market); *Ershowsky v. Freedman (In re Freedman)*, 2010 Bankr. LEXIS 1832 (Bankr. S.D Fla. June 4, 2010) (where the debtor misrepresented the value of his company and failed to disclose significant indebtedness to creditor to induce the creditor to stay with the company); *Jones v. Lawson (In re Lawson)*, 2007 Bankr. LEXIS 1458 (Bankr. N.D. Ohio April 23, 2007) (where the creditor loaned the debtor money to build a spec home for sale, and the debtor misrepresented to the creditor that he intended to repay the loan from the sale proceeds when he had actually borrowed far in excess of what he ever anticipated selling the home for).

[7] To the extent that the representations could be construed as relating to the use of the Loans—that is, that the Loans would be used to win custody of his children from their allegedly abusive and neglectful mother—it is true that misrepresenting what a loan will be used for can amount to a misrepresentation that will result in that loan being declared nondischargeable. *See, e.g., Lamesa Economic Development Corp. v. Metcalf (In re Metcalf)*, 2006 Bankr. LEXIS 2778 (Bankr. N.D. Tex. Oct. 6, 2006). But in this case there is no dispute that Warren used the Loans to pay for exactly what he said he was going to pay for: lawyers and other expenses related to his divorce and custody battle and providing Emma with medical care.

[8] *Schaffer v. La. State Board of Dentistry (In re Shaffer)*, 515 F.3d 424, 429 (5th Cir. 2008) (emphasis original) (internal quotations omitted).

9

is necessarily hesitant to deny discharge of the debt to Mosiman based on the statements regarding Warren's ex-wife, daughters, and father-in-law.

Though its inclination is to end the discussion here, the court is aware that in recent years appellate courts have been more willing to expand the scope of nondischargeability actions given the right circumstances. *See, e.g., Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 860 (5th Cir. 2004) (holding through an expansive reading of Code § 727(a)(4), that a number of factual errors in the debtors' schedules amounted to sufficient cause to deny debtors' discharge). That being the case, the court will evaluate Mosiman's claim under the tests for false pretenses, a false representation, and actual fraud mentioned above.

Another unusual aspect of this case is that Mosiman is alleging that she relied on so many different statements. But all of the statements really add up two representations: (1) "Emma is sick, and I needed money to provide her with medical care, but I cannot afford to pay for it;" (2) "My daughters are in danger as long as they are in Bird's custody, and I cannot pay for divorce lawyers."[9]

In order to prove that the statements regarding Warren's ex-wife, daughters, and father-in-law amounted to false pretenses or false representations under section 523(a)(2)(A), Mosiman must prove that the statements were, *inter alia*, knowing and fraudulent falsehoods. *In re Allison*, 960 F.2d at 483. But Mosiman has not proven that any of the statements were knowing or fraudulent falsehoods. In fact, the evidence at trial

---

[9] The only exception is the accusation that Cavanaugh was molesting one of Warren's daughters. Though Cavanaugh testified that this accusation is not true, Warren testified that he still believes it to be true. The court does not find that Warren in fact did not believe his allegations respecting Cavanaugh. Indeed Mosiman testified that she believed Warren believed all his allegations respecting Bird and Cavanaugh.

actually suggests that it is more likely than not that some of them are true. As for the rest of them, it is more likely than not that Warren believed most were true. Indeed, Mosiman testified that she thought Warren believed what he was telling her.

The first group of statements that were actually true amounted to a representation that Emma was sick and that she needed medical care that Warren could not afford. These statements included (a) that Emma showed signs of illness and Bird was not going to seek treatment; (b) that Warren needed money for Emma's doctors; and (c) that he needed to take Emma to a doctor in Alabama. These statements were undoubtedly true. In fact, despite Mosiman's contributions, and despite visiting the doctor in Alabama, Emma died. Bird admitted on the stand that she did not initially consider Emma's illness to be that serious. And it is clear that Warren could not have afforded to pay for doctors without Mosiman's help.

The second group of statements that proved to be true amounted to a representation that Warren could not afford legal representation, and they include (a) that Warren could not support himself because of criminal charges pending against him and the high cost of divorce attorneys; (b) that Warren felt he needed the best attorneys to represent him in his divorce; and (c) that he needed a decent place to live to assist in his effort to obtain custody of his daughters. There is no dispute that Warren did not have a source of income during the time that Mosiman was advancing the Loans. Furthermore, his conduct evidences that he felt he needed the best lawyers to represent him—he hired lawyers who he believed were the best (and, based on their fees, so did they). That he needed a decent place to live was actually the advice of his then-lawyer, Vanden Eykel.

11

The remaining statements amounted to a representation that Bird is a terrible woman who is a danger to his daughters. The evidence suggests that, even accepting that most of those statements were untrue, Warren believed that most were true when he made them. These statements include (a) that Warren was worried about Bird's mental condition; (b) that Emma's illness affected primarily Jewish children and, because neither he nor Bird are Jewish, he was not sure if he was Emma's biological father;[10] (c) that Bird had taken everything out of his house and put it in storage; (d) that he believed Bird was going to hurt their daughters; and (e) that Bird tried to kill him in his sleep. Warren's conduct certainly indicates that he believed that Bird was unstable and dangerous to his daughters. That is, he spared no expense in contesting custody in the divorce court. This suggests that be believed his daughters were in danger. On lawyers' fees alone he spent at least $275,000 trying to obtain custody. Though there is conflicting testimony as to whether some of his suspicions were in fact true, there is no evidence that suggests that Warren did not believe them to be true. In fact, the evidence suggests he did.

Several of the representations – that Bird's rape charge was false and that his daughters demonstrated provocative poses and had cuts in inappropriate places – fall into a different category. If the representations were false, Warren knew that. On the other hand, the court, on the record before it, is not prepared to find that Warren raped Bird or that he did not observe the girls posing provactively or cuts on them in places that led him to suspect Bird was mistreating them. The evidence that the facts were other than as Warren represented is inadequate for the court to conclude that Mosiman showed by a

---

[10] Warren testified that he now knows for sure that he was Emma's biological father. Mosiman has failed to prove, however, that Warren was not unsure at the time he made the statement.

12

preponderance of the evidence that Warrant was lying.[11]

The requirements for denying Warren's discharge for actual fraud under section 523(a)(2)(A) include, *inter alia*, (1) that he made representations he knew were false and (2) that he made the representations with the intention and purpose to deceive Mosiman. *Pentecost*, 44 F.3d at 1293. For the same reasons discussed with respect to false pretenses and false representations, the court concludes that none of the statements regarding Warren's ex-wife, daughters, or father-in-law amount to actual fraud. Not only were some of the statements proven to be true, but none were proven to be false. That being the case, and it also being the case the Warren believed many of the statements to be true when he made them, Warren could not have made those with the purpose and intention to deceive Mosiman.

### III. CONCLUSION

None of the statements that Warren made to Mosiman amounted to false pretenses, a false representation, or actual fraud within the meaning of section 523(a)(2)(A) of the Code. Thus, her complaint to determine dischargeability must be DENIED. The court will enter judgment accordingly.

### END OF MEMORANDUM OPINION ###

---

[11] Mosiman offered into evidence documents generated by the authorities in Rockwall County that suggest *they* thought Warrant was guilty of misconduct toward his wife and daughters. Not only do those documents constitute hearsay; the court sees no way that it could test their veracity or the degree of certainty of their authors.

14